UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JERRY WHITNEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case no. 4:15CV1000 PLC |
| ) | |
| NANCY A. BERRYHILL,[1] ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

Jerry Whitney ("Plaintiff") seeks review of the decision of the Social Security Commissioner, Nancy Berryhill, denying his application for Supplemental Security Income under the Social Security Act.[2] The Court has reviewed the parties' briefs and the entire administrative record, including the hearing transcript and medical evidence. For the reasons set forth below, the case is reversed and remanded.

### I.  *Background and Procedural History*

On December 8, 2011, Plaintiff filed an application for Supplemental Security Income alleging that he was disabled as of January 1, 2007 as a result of "pinched nerve in lower back, arthritis, depression, anxiety, 11th rib broken, right ankle fractor [sic], nose broken, low blood pressure."[3] (Tr. 161-66 209-18). The Social Security Administration (SSA) denied Plaintiff's

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).
[2] The parties consented to the exercise of authority by the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (ECF No. 11).
[3] The SSA denied Plaintiff's previous application for Social Security benefits on April 28, 2010. (Tr. 206-07).

1

claims, and he filed a timely request for a hearing before an administrative law judge (ALJ). (Tr. 60-64, 65-66).

The SSA granted Plaintiff's request for review, and an ALJ conducted a hearing on January 1, 2014.[4] (Tr. 60-64, 40-53). At the hearing, Plaintiff testified that he was fifty-nine years old and had an eighth grade education and a history of drug and alcohol abuse. (Tr. 40). Plaintiff stated that he received food stamps and he was living "with a friend right now. . . . I was homeless up until then." (Tr. 41). Plaintiff testified that he was able to read "a little" and walk two blocks without an assistive device. (Tr. 44). Plaintiff explained that he ceased wearing his medical boot because "there was too much pressure on it, and beside [sic], it had worn out, and I didn't think to go back and have them to reschedule me another one." (Tr. 42-43). Plaintiff further stated: "I've been trying to make it work on my own. I have a – a pusher that allows…that helps me when I'm out and about." (Tr. 43). Plaintiff's counsel stipulated that Plaintiff "is able to do a full range of medium work, except for the mental." (Id.).

A vocational expert (VE) also testified at the administrative hearing. (Tr. 46-53). The ALJ asked the VE to consider an hypothetical individual with Plaintiff's age, education, and background, including a history of incarceration and homelessness, who was "able to do simple, repetitive, unskilled tasks; brief and occasional superficial interaction with the general public; frequent interaction with supervisors and coworkers; working better with things rather than

---

[4] Plaintiff failed to appear at the administrative hearing originally scheduled for 11:00 a.m. on August 27, 2013. (Tr. 54-56). The SSA issued a request to show cause for failure to appear, and Plaintiff submitted the following statement:
> I Jerry Whitney was late to my hearing [b]ecause I didn't sleep the night before my hearing. I am homeless and have difficulty keeping track of my paperwork and appointment dates and times. I also have difficulties with [r]eading, writing and memory. I rode my bike to the hearing and my ankle [b]othered me. I didn't arrive at the hearing until 12:06 p.m. I am sorry and want to have a hearing.. . . .

(Tr. 128-30).

people; time off task, 2 percent of the work day; loss of productivity of 2 percent; and able to respond to routine changes, occasionally, in the work setting." (Tr. 48-49). The VE testified that such an individual could work as a dining room attendant, warehouse worker, or janitor. (Id.). The VE affirmed that her testimony was consistent with the Dictionary of Occupational Titles (DOT) and Occupational Handbook "except for the time off task and loss of productivity," which was "based on [her] experience having done extensive job analysis of placements over [her] years of work." (Tr. 49-50).

In a decision dated March 11, 2015, the ALJ applied the five-step evaluation process set forth in 20 C.F.R. § 416.912(d) [5] and found that Plaintiff "has not been under a disability within the meaning of the Social Security Act since December 8, 2011, the date the application was filed." (Tr. 18-36). The ALJ found that Plaintiff, who was fifty-six years of age on the date he filed the application, had the severe impairment of borderline intellectual functioning and the non-severe impairments of a right foot fracture and arthritis in his lumbar spine. (Tr. 21).

After reviewing Plaintiff's testimony and medical records, the ALJ determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible[.]" (Tr. 24). The ALJ found that Plaintiff had the residual functional capacity (RFC) to

> perform medium work as defined in 20 CFR 416.967(c) except the claimant can understand, remember, and carry out simple, repetitive, and unskilled tasks, interact occasionally, briefly, and superficially with the general public and frequently with supervisors and coworkers; work with things instead of people; stay on-task for at least 98% of the workday with no more than a 2%

---

[5] To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. § 416.920(a). Those steps require a claimant to show that he or she: (1) is not engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments which significantly limits his or her physical or mental ability to do basic work activities or (3) has an impairment which meets or exceeds one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1; (4) is unable to return to his or her past relevant work; and (5) the impairments prevent him or her from doing any other work. Id.

3

loss in productivity; and occasionally respond to routine changes in the work setting.

(Tr. 22).

The ALJ found that Plaintiff could not perform his past relevant work as an industrial cleaner because "an industrial cleaner generally needs to perform at a level 2 reasoning and language development level." (Tr. 29). The ALJ explained: "This requires carrying out detailed but uninvolved instructions and reading at a slightly complex level. The undersigned does not find this compatible with the residual functional capacity noted above." (Id.). However, the ALJ found that Plaintiff could perform other jobs and was, therefore, not disabled. (Tr. 30).

Plaintiff filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review on April 30, 2015. (Tr. 12, 1-6). Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the SSA's final decision. Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

## II.   *Standard of Review*

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Boerst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). In determining whether the evidence is substantial, a court considers evidence that both supports and detracts from the Commissioner's decision. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). However, a court "do[es] not reweigh the evidence presented to the ALJ and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reason and substantial evidence." Renstrue v. Astrue, 680

F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)).

"If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." Partee v. Astrue, 638 F.3d 860, 863 (8th Cir. 2011) (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). The Eighth Circuit has repeatedly held that a court should "defer heavily to the findings and conclusions" of the Social Security Administration. Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001).

### III. Discussion

Plaintiff claims that substantial evidence does not support the ALJ's determination that he is not disabled. Plaintiff asserts the ALJ erred in: (1) finding that his foot fracture was a non-severe impairment; (2) failing to find his foot fracture an "additional and significant work-related limitation of function" for purposes of Listing 12.05C; (3) relying upon the VE's testimony that Plaintiff could perform jobs requiring level two reasoning and language abilities; and (4) failing to weigh the state agency consultant's medical opinion. (ECF No. 14). In response, Defendant asserts that the ALJ: (1) properly found that Plaintiff's foot fracture was a non-severe impairment and his impairments did not satisfy Listing 12.05(C); (2) properly relied on the VE's testimony; and (3) did not err in failing to discuss the state agency consultant's medical opinion. (ECF No. 19).

A. *Step 2 - severity of foot injury*

Plaintiff first argues that the ALJ failed to properly consider his foot fracture at step two of the sequential evaluation. Defendant counters that the lack of treatment supported the ALJ's determination that Plaintiff's foot fracture was non-severe.

At step two of the evaluation process, the ALJ must determine if a claimant suffers from a severe impairment. Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007). See also 20 C.F.R. § 416.920(a)(4)(ii). To demonstrate that an impairment is severe, a claimant must show that he has (1) a medically determinable impairment or combination of impairments, which (2) "significantly limits [his] physical or mental ability to do basic work activities," without regard to age, education, or work experience. 20 C.F.R. §§ 416.920(a)(4)(ii), (c); 416.921(a). An impairment "is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.921(a). See also Kirby, 500 F.3d at 707 ("An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities."). Although a claimant has "the burden of showing a severe impairment that significantly limited [his] physical or mental ability to perform basic work activities[,]…the burden of a claimant at this stage of the analysis is not great." Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001). See also Kirby, 500 F.3d at 708 ("Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard.").

At the hearing, Plaintiff appeared without an assistive device and testified that he could walk approximately two blocks without one. (Tr. 44). When the ALJ asked Plaintiff why he did not "wear the boot so your foot could get better quicker?," Plaintiff answered, "[I]t did pretty well without – there was too much pressure on it, and beside [sic], it had worn out, and I didn't think to go back and have them to reschedule me another one." (Tr. 43). Plaintiff had not

acquired a replacement boot but rather was "trying to make it work on my own" and used a "pusher" when he was "out and about." (Id.). Plaintiff testified that a doctor at Barnes-Jewish Hospital prescribed the "pusher." (Id.).

Plaintiff's medical records demonstrate that he first presented to the emergency room for his foot fracture on November 29, 2011. (Tr. 562). Plaintiff stated that he was the victim of an assault and reported "pain to right foot, thinks it may have been stepped on, now difficult to walk." (Id.). An x-ray of his foot revealed a "Lisfranc fracture-dislocation injury of the right foot with lateral subluxation of the 2nd through 4th metatarsal heads and widening of the Lisfranc joint. There are likely fractures through the bases of the first and fourth metatarsal heads. Additional fractures are also likely present . . . ." (Tr. 573-74). Plaintiff underwent open reduction and internal fixation surgery on December 2, 2011. (Tr. 625-26). He returned to the emergency room for a wound check on December 12, 2011 and the removal of his sutures on December 16, 2011. (Tr. 541-48, 709-11).

On January 9, 2012, Plaintiff presented to the emergency room for pain in his right foot. (Tr. 686-88). Plaintiff reported that "someone stomped on [my foot] and I had to have surgery in early December. Now I ran out of my pain medication and I missed a follow up appointment because of the weather." (Id.) The emergency room physician noted that Plaintiff "was supposed to be non-weight[-]bearing but has been out of his moon boot, ambulating." (Tr. 690). The doctor discharged Plaintiff with instructions to wear the moon boot, use crutches, and remain non-weight-bearing. (Id.). Plaintiff received a refill of his medication at Grace Hill Neighborhood Health Services on January 20, 2012. (Tr. 676-78).

Plaintiff did not seek further treatment for his right foot until October 22, 2012. (Tr. 680-83). Plaintiff reported "pain on the right inside inner foot" and stated that he had "been having

problems since" his surgery in December 2011. (Tr. 680). A nurse's note stated: "Assistive devices: cane(s)." (Tr. 681). Plaintiff left the hospital before seeing a physician. (Tr. 681, 683).

At step two of the sequential evaluation process, the ALJ reviewed the medical records relating to Plaintiff's right foot and found that the "right foot fracture do[es] not cause more than minimal limitations in the claimant's ability to perform basic work activities" and was therefore a non-severe impairment. (Tr. 20-21). In formulating Plaintiff's RFC, the ALJ discussed several reasons that are well-supported by the record for finding that Plaintiff's foot fracture had minimal effect on his ability to work. First, the ALJ noted that Plaintiff's "limited treatment for [this] impairment[] strongly supports a finding that [it] is not limiting." (Tr. 24). The ALJ acknowledged that Plaintiff "has financial constraints which may limit his treatment," but concluded "the claimant is aware of low-cost to free options which are available to him, including the emergency room." (Id.). Finally, the ALJ found that the facts that Plaintiff left the emergency room in October 2012 before being treated and failed to follow his prescribed treatment, which included wearing a boot and maintaining non-weight-bearing status, demonstrated that the right foot fracture was not debilitating. (Id.).

Although Plaintiff demonstrated that he suffered a fracture in his foot, he did not meet his burden of showing that the injury significantly affected his ability to do basic work activities. Plaintiff testified that he was able to walk two blocks without an assistive device (Tr. 44). Plaintiff did not submit an adult function report with his December 2011 application but, in a third-party adult function report, Plaintiff's friend opined that Plaintiff was able to walk approximately ten blocks. (Tr. 202). Additionally, in his response to the ALJ's show cause order of August 2013, Plaintiff stated that he became lost while riding his bicycle to the hearing.

8

(Tr. 130). The fact that Plaintiff was able to ride a bicycle in August 2013 suggests that his foot fracture did not significantly limit his ability to perform basic work activities.

Plaintiff asserts that the ALJ failed to consider Plaintiff's diminished intellectual capacity and improperly relied "upon his assumptions regarding emergency room healthcare, and his incorrect assertions that such treatment is without financial consequences to a patient." (ECF No. 14 at 11). "Economic justifications for the lack of treatment can be relevant to a disability determination." Clark v. Shalala, 28 F.3d 828, 831 n.4 (8th Cir. 1994). In this case, the ALJ acknowledged Plaintiff's financial constraints, including "that he is homeless and relying on others for some necessities," but found that Plaintiff "is aware of low-cost to free options which are available to him, including the emergency room." (Tr. 24).

The evidence did not support Plaintiff's suggestion on appeal that his lack of treatment was the result of his financial constraints or diminished intellectual capacity. To the contrary, the evidence established that Plaintiff could obtain medical care when he thought it was necessary. Plaintiff repeatedly obtained medical care at the Barnes Jewish Hospital emergency room. (Tr. 537, 527, 562, 541-48, 709-11, 686-90, 680-83). Plaintiff also received care at Connect Care and the Grace Hill Neighborhood Health Center, both of which are free clinics. See Hall v. Astrue, Case No. 4:11CV1283 ERW, 2012 WL 3230555, at *2 (E.D.Mo. July 6, 2012). (Tr. 546-53, 604-08, 283-84, 668-71, 672-73, 674-75, 676-78). Moreover, the record contains no evidence that Plaintiff was denied treatment due to his inability to pay. See Goff, 421 F.3d at 790 (the ALJ correctly discounted the plaintiff's subjective complaints when there was no evidence that the plaintiff was ever denied medical treatment for financial reasons).[6]

---

[6] Plaintiff also argued that "[t]he ALJ's finding that Plaintiff is limited to medium exertion in the RFC is inconsistent with the finding that the foot injury is not a severe impairment." (ECF No. 14 at 12). Plaintiff cites no authority for the proposition that if a claimant is limited to medium work, then the claimant necessarily suffers a severe impairment.

The ALJ did not improperly consider Plaintiff's lack of treatment when determining that Plaintiff's foot injury was a non-severe impairment. For the above reasons, the Court finds that substantial evidence supported the ALJ's finding that Plaintiff's foot injury was a non-severe impairment.

B.  *Step 3 - Listing § 12.05C*[7]

Plaintiff argues that the ALJ erred at step three of the sequential evaluation process when he found that Plaintiff's impairments did not satisfy Listing 12.05C, governing intellectual disability (formerly labeled "mental retardation").[8] More specifically, Plaintiff asserts that the ALJ improperly determined that Plaintiff's foot injury did not constitute an "additional and significant work-related limitation of function." The Commissioner counters that the ALJ properly determined Plaintiff did not meet the requirements of a listed impairment under Listing 12.05C.

To meet Listing 12.05C, a claimant must show: (1) a valid verbal, performance, or full scale IQ of 60 through 70; (2) an onset of "significantly subaverage general intellectual functioning with deficits in adaptive functioning" before age twenty-two; and (3) "a physical or other mental impairment imposing an additional and significant work-related limitation of function." Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006) (quoting 20 C.F.R. Pt. 404, Subpt. P, APP. 1, § 12.05C). See also Cheatum v. Astrue, 388 Fed. Appx. 574, 576 (8th Cir.

---

[7] The listings are a set of diagnostic criteria that, if met, will halt the sequential evaluation with a finding of disability at step three of the sequential evaluation process. 20 C.F.R. § 416.920(a)(4)(iii). A claimant bears the burden of showing he meets each of the specific criteria in the listed impairment. Carlson v. Astrue, 604 F.3d 589, 593 (8th Cir. 2010). The medical criteria for listed impairments are "at a higher level of severity than the statutory standard" because "the listings were designed to operate as a presumption of disability that makes further inquiry unnecessary." Sullivan v. Zebley, 493 U.S. 521, 532 (1990).

[8] Effective January 17, 2017, the Social Security Administration amended the criteria in the listings used to evaluate claims of intellectual disability and eliminated listing 12.05C. See www.federalregister.gov/documents/2016/09/26/2016-22908/revised-medical-criteria-for-evaluating-mental-disorders (lasted visited Jan. 17, 2017).

2010) (unpublished) (requirements include showing deficits in adaptive functioning). A claimant must show that he or she meets all of the criteria for the listed impairment, as "[a]n impairment that manifests only some of [a Listing's] criteria, no matter how severely, does not qualify." Sullivan v. Zebley, 493 U.S. 521, 532 (1990).

At step three of the sequential evaluation process, the ALJ considered whether Plaintiff's impairment or combination of impairments met or medically equaled the severity of Listing 12.05C for intellectual disability. As an initial matter, the ALJ stated there was "no evidence of onset of the impairment before the age 22." (Tr. 21). In regard to adaptive functioning, the ALJ noted that, according to Plaintiff's August 2008 function report, Plaintiff could handle his personal care, perform household chores, including repairs and yard work, use public transportation, and shop. (Id.). The ALJ further found that, even assuming Plaintiff had significantly subaverage functioning deficits prior to age twenty-two, he did not satisfy the criteria of 12.05C because Plaintiff's "arthritis and right foot fracture do not impose significant work-related limitations." (Tr. 22).

In this case, the evidence did not show that Plaintiff had deficits in adaptive behavior initially manifested prior to age twenty-two. As the ALJ noted in his decision, the evidence established that, as late as 2008, the Plaintiff was able to take care of his personal needs, complete household work, use public transportation, and shop. See, e.g., Johnson v. Colvin, 788 F.3d 870, 873 (8th Cir. 2015) (the plaintiff's ability to read, write, count change, care for herself and her child, and perform most household tasks was "not consistent with the deficits in adaptive functioning contemplated by Listing 12.05C.").

Additionally, Plaintiff did not claim an intellectual disability when applying for benefits. "The absence of a record of treatment, diagnosis, or even inquiry into a mental impairment prior

to applying for benefits weighs against finding there to be an impairment." Clay v. Barnhart, 417 F.3d 922, 929 (8th Cir. 2005) (the plaintiff's failure to initially claim mental retardation supported the ALJ's finding that the plaintiff did not satisfy Listing 12.05C criteria). Moreover, none of the medical sources of record diagnosed Plaintiff with an intellectual disability. Rather, three consulting medical experts diagnosed Plaintiff with borderline intellectual functioning, not intellectual disability. (Tr. 310, 507, 513). See e.g., Cox v. Astrue, 495 F.3d 614, 618 (8th Cir. 2007) (effective diagnosis of borderline intellectual functioning contrary to finding of mild mental retardation).

Based on the above, the Court concludes that substantial evidence supported the ALJ's determination that Plaintiff's impairments neither met nor equaled those limitations set forth in Listing 12.05C.[9] The Court reaches this conclusion with full awareness of the very real difficulties Plaintiff appears to experience. "The difficulties are not sufficient to merit reversal, however, because 'we will not reverse the decision even if substantial evidence also supports a different outcome.'" Cox, 495 F.3d at 619 (quoting Stormo v. Barnhart, 377 F.3d 801, 805 (8th Cir. 2004)).

C. *Step 5 – ability to perform other work*

In his third argument, Plaintiff claims the ALJ erred at step five when he found, based upon the VE's testimony, that Plaintiff was capable of performing jobs that existed in the national economy. Plaintiff asserts that the VE's testimony did not provide substantial evidence for such finding because it was in conflict with the DOT and the VE did not explain the inconsistencies. In response, the Commissioner asserts that the ALJ properly relied on the VE's

---

[9] Because we find that Plaintiff did not meet the second element of Listing 12.05C, the Court does not reach the question of whether his foot injury met the third element of "a physical or other mental impairment imposing an additional and significant work-related limitation of function." See e.g., Phillips v. Colvin, 721 F.3d 623, 629 n.4 (8th Cir. 2013).

12

testimony because the VE adequately addressed any conflict between her testimony and the DOT.

If the ALJ finds at step four of the sequential evaluation process that a claimant cannot perform his past relevant work, the ALJ proceeds to step five, where the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform other work that exists in significant numbers in the national economy. 20 C.F.R. §§ 416.920(a)(4)(v), 416.960(c). See also Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). "Generally, if the claimant suffers from nonexertional impairments that limit [his] ability to perform the full range of work described in one of the specific categories set forth in the guidelines, the ALJ is required to utilize testimony of a vocational expert." Jones v. Astrue, 619 F.3d 963, 971-72 (8th Cir. 2010) (quoting Reed v. Sullivan, 988 F.2d 812, 816 (8th Cir. 1993)).

Vocational expert testimony should generally be consistent with the Dictionary of Occupational Titles (DOT). See Policy Interpretation Ruling: Title II and XVI: Use of Vocational Expert & Vocational Specialist Evidence, & Other Reliable Occupational Information in Disability Decisions, SSR 00-4P (S.S.A. Dec. 4, 2000). Pursuant to SSR 00-4p, the ALJ must "ask about any conflict" between VE evidence and "information provided in the DOT." Id. In response, "[a] VE must offer an explanation for any inconsistencies between [the VE's] testimony and the DOT, which the ALJ may accept as reasonable after evaluation." Moore v. Colvin, 769 F.3d 987, 990 (8th Cir. 2014). "Absent adequate rebuttal, however, VE testimony that conflicts with the DOT 'does not constitute substantial evidence upon which the Commissioner may rely to meet the burden of proving the existence of other jobs in the economy a claimant can perform.'" Id. (quoting Kemp v. Colvin, 743 F.3d 630, 632 (8th Cir. 2014)). On the other hand, "[w]hen an ALJ has posed a hypothetical that accurately reflects his RFC finding,

13

questioned the VE about any apparent inconsistencies with the relevant DOT job descriptions, and explained his decision to credit the VE's testimony, the ALJ has complied with SSR 00-4p[.]" Welsh v. Colvin, 765 F.3d 926, 930 (8th Cir. 2014) (citing Jones, 619 F.3d at 978).

At the hearing, the ALJ asked the VE to consider a hypothetical individual with Plaintiff's "age, education, and background…functioning at the level of being able to read car ads and want ads, in an assistive living situation where he had been homeless and is now helped by a friend providing living arrangements; past history of incarceration and no educational benefits or work history associated with the past incarceration." (Tr. 48-49). In the first hypothetical, the ALJ added the following non-exertional limitations: "able to do simple, repetitive, unskilled tasks; brief and occasional superficial interaction with the general public; frequent interaction with supervisors and coworkers; working better with things rather than people; time off task, 2 percent of the work day; loss of productivity of 2 percent; and able to respond to routine changes, occasionally, in the work setting." (Tr. 49).

The VE testified that such an individual could work as a dining room attendant, warehouse worker, or "janitor."[10] (Id.). The VE affirmed that her testimony was consistent with the DOT and Occupational Handbook "except for the time off task and loss of productivity," which was "based on [her] experience having done extensive job analysis of placements over [her] years of work." (Tr. 49-50).

In his decision, the ALJ determined that Plaintiff had the RFC to perform medium work

> except the claimant can understand, remember, and carry out simple, repetitive, and unskilled tasks; interact occasionally, briefly, and superficially with the general public and frequently with supervisors and coworkers; work with things instead of people; stay on-task for at least 98% of the workday with

---

[10] Although the VE referred to this occupation as "janitor, 381.687-018," the DOT labels it "cleaner, industrial." In an effort to avoid confusion, the Court will refer to this occupation as "industrial cleaner."

14

no more than a 2% loss in productivity; and occasionally respond to routine changes in the work setting.

(Tr. 22). Based on this RFC, the ALJ determined in step four that Plaintiff was unable to perform his past relevant work as an industrial cleaner (DOT 381.687-018) because that job required level two reasoning and language development.[11] (Tr. 29). The ALJ explained:

> Although the claimant can perform a reduced range of medium work, an industrial cleaner generally needs to perform at a level 2 reasoning and language development level. This requires carrying out detailed but uninvolved instructions and reading at a slightly complex level. The undersigned does not find this compatible with the residual functional capacity note above.

(Id.).

Despite finding at step four that Plaintiff could not perform the work of an industrial cleaner, the ALJ cited the VE's testimony that Plaintiff could work as an industrial cleaner in support of his finding at step five that Plaintiff could perform other work. (Tr. 30). More specifically, the ALJ cited the VE's testimony that Plaintiff was capable of performing the jobs of industrial cleaner (DOT 381.687-018), dining room attendant (DOT 311.677-018), and warehouse worker (DOT 922.687-058), and he stated that such testimony was "consistent with the information contained in the [DOT]." (Id.). Based upon that testimony, the ALJ concluded

---

[11] According to the DOT, reasoning development level two requires an employee to "apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations." DOT, Appendix. C, Components of the Definition Trailer. Language development level two means:
> Reading: Passive vocabulary of 5,000-6,000 words. Read at rate of 190-215 words per minute. Read adventure stories and comic books, looking up unfamiliar words in dictionary for meaning, spelling, and pronunciation. Read instructions for assembling model cars and airplanes.
> Writing: Write compound and complex sentences, using cursive style, proper end punctuation, and employing adjectives and adverbs.
> Speaking: Speak clearly and distinctly with appropriate pauses and emphasis, correct punctuation, variations in word order, using present, perfect, and future tenses.

(Id.).

that Plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy" and was therefore not disabled. (Tr. 30).

The Court recognizes that "[a]n ALJ may rely on a vocational expert's testimony as long as some of the identified jobs satisfy the claimant's residual functional capacity." Grable v. Colvin, 770 F.3d 1196, 1202 (8th Cir. 2014). Here, however, the two other positions – dining room attendant and warehouse worker – similarly required reasoning skills beyond Plaintiff's RFC. According to the DOT, the jobs of dining room attendant and warehouse worker require language level 1 and reasoning level 2. DOT 311.677-018, DOT 922.687-058. Significantly, neither the VE nor the ALJ addressed the conflict between the Plaintiff's RFC and the DOT descriptions of the jobs identified by the VE.

The Commissioner contends that the conflict between the DOT and the VE's testimony did not invalidate the VE's testimony because an ALJ "may rely on '[i]nformation about a particular job's requirements…available in other reliable publications, information obtained directly from employer's, or from a VE's…experience in job placement or career counseling.'" Welsh, 765 F.3d at 930 (citing SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000)). However, the VE's general statement that her testimony was consistent with the DOT and based upon her work experience was insufficient to resolve the conflict. When a conflict exists between the VE's testimony and the DOT, the ALJ "must resolve the conflict by determining if the explanation given by the [VE] is reasonable and provides a basis for relying on the [VE] testimony rather than on the DOT information." SSR 00-4P (2000). In this case, the ALJ relied on the VE's testimony without explaining or resolving the apparent conflict. See, e.g., Moore, 769 F.3d at 990; Kemp, 743 F.3d at 633.

Because the VE's testimony conflicted with the DOT and the VE offered no explanation for the conflict, there was no substantial evidence to support the ALJ's step-five determination that jobs existed in the economy that Plaintiff was capable of performing. See, e.g., Kemp, 743 F.3d at 633. Accordingly, the Court must reverse the Commissioner's decision because the "Commissioner did not meet her burden, at step five of the sequential evaluation process, of establishing that jobs existed in the economy that" Plaintiff "was capable of performing," given his age, education, work experience, and RFC. Id.

*D. Medical opinion evidence*

In his final argument, Plaintiff claims that the ALJ erred in failing to weigh the April 2010 medical opinion of the state agency psychological consultant, Dr. Marsha Toll. Although Dr. Toll performed that evaluation in relation to Plaintiff's earlier, unsuccessful claim for benefits, Plaintiff asserts that it "was produced in a period relevant to Plaintiff's later claim, as he alleged an onset date of 2007[.]"[12] (ECF No. 14 at 15). The Commissioner counters that the ALJ was not required to weigh the opinion evidence from Plaintiff's previous claim.

In determining a claimant's RFC, the ALJ is required to consider the medical opinion evidence of record together with the other relevant evidence. 20 C.F.R. § 416.927(b). Unless the ALJ assigns controlling weight to a treating physician's opinion, the ALJ must explain the weight given to every medical opinion of record, regardless of its source. See 20 C.F.R. §§ 416.927(c).

---

[12] Plaintiff asserted that, by considering medical opinions obtained in relation to Plaintiff's earlier application, the ALJ constructively reopened the 2010 denial. In response, the Commissioner correctly argues that "the mere allowance of evidence from the earlier applications, without more, cannot be considered a reopening of the earlier case." Burk-Marshall v. Shalala, 7 F.3d 1346, 1348 (8th Cir. 1993). The ALJ did not constructively reopen Plaintiff's previous application, as there is no evidence that Plaintiff requested the ALJ reopen the earlier application and the ALJ did not consider the earlier application on the merits. See, e.g., Hudson v. Bowen, 870 F.2d 1392, 1394-95 (8th Cir. 1989); cf. Jelinek v. Heckler, 764 F.2d 507, 508 (8th Cir. 1985).

17

Dr. Toll completed a psychiatric review technique and mental RFC assessment for Plaintiff on April 27, 2010 in relation to Plaintiff's earlier application for Social Security benefits. (Tr. 510-24). Dr. Toll based her opinion upon Plaintiff's medical records and function report, and she diagnosed Plaintiff with borderline intellectual functioning and "personality d/o NOS w/cluster b traits." (Tr. 513, 515, 520). Dr. Toll found Plaintiff was not significantly limited in most areas of understanding and memory, sustained concentration and persistence, and adaptation. (Tr. 522-23). However, she determined that Plaintiff was "moderately limited" in his abilities to: understand and remember very short and simple instructions; maintain attention and concentration for extended periods; sustain an ordinary routine without special supervision; interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 522-23). (Id.).

In his decision, the ALJ weighed the opinions of three consultative examiners who examined and evaluated Plaintiff in 2010 for his prior application, and the ALJ assigned each of those opinions either some weight or significant weight.[13] (Tr. 27). The ALJ also considered the February 2012 medical opinion of state agency consultant Dr. Robert Cottone and assigned it "little weight[.]" (Tr. 27, 613-24). The ALJ did not discuss Dr. Toll's April 2010 opinion.

The ALJ failed to comply with the regulations when he did not explain the weight, if any, given to Dr. Toll's opinion. See 416 C.F.R. § 416.927. "The ALJ may have considered and for valid reasons rejected the … evidence proffered …; but as he did not address these matters, we

---

[13] Specifically, the ALJ considered the: psychological evaluation completed by Dr. Georgia Jones in February 2010; consultative examination completed by Dr. Loretta Mendoza in February 2010; and WAIS-IV testing administered by Dr. Lenora Brown in April 2010. (Tr. 27, 492-96, 500-02, 506-07).

are unable to determine whether any such rejection is based on substantial evidence." Jones v. Chater, 65 F.3d 102, 104 (8th Cir. 1995). "Initial determinations of fact and credibility are for the ALJ, and must be set out in the decision…; we cannot speculate whether or why an ALJ rejected certain evidence." Id. (internal citation omitted).

The Commissioner argues that the ALJ was not required to consider Dr. Toll's opinion because it was obtained in relation to a previous application for Social Security benefits and "substantially predated the relevant period in this case[.]" (ECF No. 19 at 13). However, Dr. Toll's opinion was relevant to the ALJ's disability determination because it related to the impairments at issue in the present proceedings. See Cunningham v. Apfel, 222 F.3d 496, 501-02 (8th Cir. 2000). "The timing of an examination is not dispositive of whether evidence is material[.]" Id. at 502. Upon remand, the Commissioner shall consider all relevant evidence of record relating to Plaintiff's impairments, including Dr. Toll's medical opinion.

## IV. Conclusion

For the reasons set forth above, the court finds that substantial evidence did not support the Commissioner's decision. The Commissioner's decision is reversed and remanded for an appropriate analysis of the medical opinion evidence and Plaintiff's ability to perform jobs existing in significant numbers in the national economy. Accordingly,

**IT IS HEREBY ORDERED** that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner is **REVERSED**, and this cause is **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

A judgment of reversal and remand shall accompany this memorandum and order.

_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 25th day of January, 2017